HEARD NOVEMBER TERM, 1875.

## REYNOLDS *vs.* TIMMONS.

A purchaser at a sale under the decree of an Ordinary for partition is not discharged from his liability by transferring his bid to a third person. Payment alone discharges him.

If the Ordinary takes security from the transferee of the bid, that may increase the sources to which the parties entitled may look for payment, but it does not discharge the bidder.

Where an Ordinary became the purchaser at a sale made under his own decree for partition, and afterwards transferred his bid, and the transferee complied with the terms of sale: *Held,* That the Ordinary and the sureties on his official bond were liable for the amount of the bid.

An order for injunction under a creditor's bill restraining creditors from suing and calling them in to prove their claims in that case is subect to the entire control of the Court which made the order, and does not invalidate a decree made by it establishing a claim in another cause which could have been proved under the order.

BEFORE TOWNSEND, J., AT MARION, MARCH, 1873.

This was a bill in equity by Melinda A. Reynolds, Sophia E. Reynolds and Henry S. Reynolds, the two last named being infants of tender years, by next friend, against W. B. Timmons and J. F. Pearce, executors of J. Gadsden Gregg, deceased, Dr. E. Miller, Asa Godbold, Jr., administrator of Asa Godbold, deceased, and E. B. Ellerbe, G. Berry, E. J. Moody, Asa Godbold, Jr., and J. H. Moody.

The case is as follows:

Samuel M. Reynolds died intestate some time in the year 1858, leaving as his heirs at law M. A. Reynolds and two children, Sophia E. and Henry S. Reynolds, infants of tender years. Intestate left some personal estate and a tract of land containing eleven acres, with dwelling house, office and other outbuildings upon it. Administration of the personalty was committed to Robert L. Singletary, a brother of Mrs. Reynolds, who properly discharged his trusts as such.

On the 5th day of January, 1863, Melinda A. Reynolds, one of the present plaintiffs, filed her petition in the Court of Ordinary for Marion District, praying that a summons in partition might issue against her two infant children, supposing that the land did not exceed in value $1,000. The prayer of the petition was granted, and accordingly a summons in partition was issued by Asa Godbold, then Ordinary, in the usual form.

William J. Singletary, another uncle of the infants, was appointed guardian *ad litem* for the infants, and his acceptance of the trust was endorsed upon the summons, over his own signature; also his acceptance of service of the summons and consent for a sale of the land in question; upon which an order of sale was made on the 12th of January, 1863, by the Ordinary, directing the Sheriff, in the usual way, to sell the lands described in the petition, on the following saleday, to wit, 2d February, 1863, on the following terms, to wit: cash sufficient to pay the expense of the proceeding and of the sale; the balance on credit of twelve months with interest from day of sale, to be secured by bond and personal security, and a mortgage of the premises, if deemed necessary.

Between the making the order of sale and the time of sale, R. L. Singletary, the administrator and brother of Mrs. Reynolds, spoke to Asa Godbold, the Ordinary, and authorized him (the Ordinary) to bid for the land for him (Singletary) as high as one thousand dollars. At the sale the defendant, Dr. E. Miller, and J. Gadsden Gregg, the testator of the defendants, Timmons and Pearce, were present, and, according to the pleadings and the evidence, they were bidders; the land was bid off by Asa Godbold, the Ordinary, at $1,100, and was so certified by the Sheriff on the back of the order of sale.

On the 7th February, 1863, the bid of Asa Godbold is said to have been transferred to Dr. E. Miller, (though no transfer was produced in evidence at the hearing,) to whom a title was made, and the terms of sale were complied with by J. Gadsden Gregg giving his bond, with R. J. Gregg as surety, for the credit portion of the sale, payable on or before the 2d day of February, 1864, with interest from the day of sale, in consideration of one hundred dollars advance upon the bid.

A few days before the bond fell due, to wit, about the 14th or 15th January, 1864, the obligor came over to the Ordinary's office and wanted to pay the bond. Godbold hesitated to receive the money because it was not due; that R. L. Singletary, who, it was supposed, represented in some way the parties in interest, might not be willing to take the money. It was finally agreed that Godbold should take the money and Gregg the bond; that Godbold should see or hear from Singletary in eight or ten days, as Gregg alleges; and if Singletary refused to take the money, that Gregg was to return the bond to the Ordinary's office, and Godbold was to re-

turn him (Gregg) his money. The principal and interest on the bond up to 2d February, 1864, was paid.

On the 15th of August, 1864, the Ordinary, after having seen Singletary, and Singletary's refusing to take the money, wrote to Gregg of Singletary's refusal to take the money, and demanded a restoration of the bond to his office. Gregg declined to do so, alleging that he was to be notified of Singletary's refusal in eight or ten days, and if he did not hear in that time he might consider the bond paid. In the meantime, about 1st of April, 1864, Godbold, in obedience to Act of the Confederate Congress, had funded the money in four per cent. Confederate certificates for the benefit of the estate of Samuel M. Reynolds.

About the 1st of January, 1867, the plaintiffs filed their bill in the Court of Equity against J. Gadsden Gregg, to compel him to restore the bond to the Ordinary's office, or to pay its amount, principal and interest.

To this bill J. Gadsden Gregg put in an answer, denying his liability, and setting up the conditional agreement with Godbold, the Ordinary, as a defense. In February, 1867, the case was heard by Chancellor Carroll, and in 1868 he rendered a decree, ordering Asa Godbold, the Ordinary, to be made a party defendant, without deciding the issues presented by the pleadings.

In October, 1868, J. Gadsden Gregg died, leaving a will, and the defendants, W. B. Timmons and James F. Pearce, qualified as executors thereto.

On the 13th January, 1869, Asa Godbold died intestate, and the defendant, Asa Godbold, Jr., obtained letters of administration upon his estate soon after the death. That afterwards, it appearing that the estate of Asa Godbold was insolvent, and one J. D. Kirkpatrick, and perhaps other creditors of the intestate, Godbold, brought suit against the administrator for the recovery of their claims, the said administrator filed what is generally called a creditor's bill against the said Kirkpatrick and others, praying for an injunction, etc.; and accordingly, on the 18th February, 1871, an order of injunction was filed, enjoining all creditors of the intestate, Godbold, from suing, etc.

In April, 1871, the plaintiffs filed their complaint, in nature of a bill of revivor, against the executors of J. Gadsden Gregg, to wit, Timmons and Pearce, and also against Asa Godbold, Jr., the administrator of Asa Godbold, the intestate. And by an amend-

ment, the defendants, Asa Godbold, Jr., E. B. Ellerbe, G. Berry, E. J. Moody and John H. Moody, were made parties defendants as sureties on the official bond of Asa Godbold, late Ordinary of Marion District.

To this complaint the defendants, Timmons and Pearce, executors of J. Gadsden Gregg, answered, setting up pretty much the same defense as their testator had done in his answer to the original bill.

The administrator of Asa Godbold also answered, denying liability of his intestate, alleging several matters of defense, and among others the injunction; that he could not be made liable in this action.

The sureties on the official bond of Asa Godbold, late Ordinary, parties defendants, answered the complaint, setting up various matters of defense; and N. E. Miller also answered.

The issues of law and fact were referred to A. Q. McDuffie, as Referee, who, after taking testimony, decided all the issues presented against the plaintiffs, except the question of injunction; and upon that he declined to express an opinion.

The plaintiffs filed the following exceptions to the report of the Referee:

1. In holding that Godbold's agency to Robert L. Singletary terminated when the land, the estate of Reynolds, brought one thousand dollars.

2. In holding that Godbold could bid at a sale made under his own decree as Ordinary and was not such a ministerial officer in a proceeding for the sale of real estate in his jurisdiction as made him an express agent for the plaintiffs and invested him with all the disabilities of a trustee and those occupying a fiduciary relation; the Referee, therefore, should have held the sale void, or voidable, at the option of the *cestui que trusts*, the plaintiffs in this action.

3. In holding that the payment of the notes in Confederate currency under the conditional agreement entered into by Gregg and Godbold was a payment and satisfaction of Gregg's bond given to the Ordinary for the purchase money of the land.

4. In giving his assent to the anomalous doctrine advanced in argument that the suit could not be entertained against Godbold's representatives and sureties, because it was said that Godbold's representatives had filed their bill to marshal assets and for injunc-

tion against his creditors. If the doctrine is admitted that a Court may enjoin itself, it is submitted in this case:

1st. There was no evidence of injunction.

2d. No evidence of the parties, plaintiffs in the so-called injunction, had complied with the prerequisites required by the practice of the Court, viz., in turning over the assets of the insolvent intestate to be administered by the Court.

3d. That the addition of the representative and sureties of Godbold as parties defendants to this cause was made by leave and order of the Court, is surely entitled to equal respect, and should be as effectual as an order of injunction.

The decree of the Court is as follows:

TOWNSEND, J.  S. M. Reynolds died intestate during the year 186 , leaving as his only heirs at law his widow, M. A. Reynolds, and two children, Sophia E. and Henry S., infants of tender years. He left a small personal estate, upon which R. L. Singletary, a brother of the widow, administered, and a tract of land containing eleven acres, with dwelling house and other buildings upon the same.

On the fifth day of January, 1863, M. A. Reynolds, the widow, filed her petition in the then Court of Ordinary against her two children, who were represented by their uncle, W. J. Singletary, as their guardian *ad litem*, praying for a partition of the real estate left by intestate. Under the proceeding an order for the sale of the same was granted by Asa Godbold, the then Ordinary. The land was bid off at the sale by Asa Godbold for the sum of eleven hundred dollars. He was authorized by R. L. Singletary to bid as high as one thousand dollars for him. One J. Gadsden Gregg, one of the defendants in this action, was desirous of purchasing the said land for his son-in-law, E. Miller, who had left funds in his hands for this purpose. Gregg contracted with Godbold to take his bid by paying him one hundred dollars and complying with the terms of the sale. The bid was accordingly transferred to Gregg and he paid the cash required and entered into bond to the Ordinary for one thousand and seventy-two dollars, the balance of the purchase money, on the second (seventh) day of February, 1863. The condition of the bond was for the payment of one thousand and seventy-two dollars on or before the second day of February, 1864.

In January, 1864, some twelve or fifteen days before the maturity of the bond, Gregg called upon Asa Godbold, the Ordinary, and proposed to pay the bond. At first Godbold declined to take the money because the bond was not due, and it was doubtful if the parties in interest would accept the Confederate currency. Finally, he agreed to take the principal and interest up to the date of the maturity of the bond, and to turn over the bond to Gregg with the understanding and agreement that R. L. Singletary, who was supposed to be acting in some way for the parties in interest, was to be consulted in eight or ten days by Godbold, and if he was unwilling to take the money Gregg was to return the bond and to receive his money. On the 15th August, 1864, Godbold wrote to Gregg that R. L. Singletary would not accept the money and he must return the bond. There is no testimony as to the knowledge of Singletary, or the parties in interest, of the fact of the payment of the money by Gregg prior to this time; Godbold invested the Confederate currency received from Gregg on the 1st day of April, 1864, in a Confederate bond, for the benefit of the estate of S. M. Reynolds.

The original bill in this case was filed by the heirs at law of S. M. Reynolds against J. Gadsden Gregg. It contains no allegations as to the irregularity or invalidity of the sale of the land, and prayed that Gregg may be required to return his bond to the office of the Ordinary, or to pay the amount of principal and interest which may be found to be due thereon. In his answer to this bill, J. Gadsden Gregg alleges the payment of the bond to Asa Godbold, as Ordinary, and the existence of an agreement between them, which was not performed by Godbold, in his failure to notify him within the time stipulated of the non-acceptance of the Confederate currency paid by him, by the parties in interest or their supposed agents; and, further, that the payment of the money to the officer authorized to receive it released him from any further liability on the said bond.

The case was heard by his Honor Chancellor Carroll, at the February term of the Court of Equity, in 1867, who did not make a decree on the merits, but ordered Asa Godbold to be made a party.

After the date of this order, J. Gadsden Gregg and Asa Godbold died; a complaint was then filed by the same plaintiffs against W. B. Timmons and James F. Pearce, executors of the last will and

testament of J. Gadsden Gregg, and Asa Godbold, Jr., administrator of the estate of Asa Godbold. This proceeding was amended by making Asa Godbold, Jr., Edward B. Ellerbe, G. W. Berry, Evander J. Moody and John H. Moody parties defendants, as sureties on the official bond of Asa Godbold, late Ordinary of Marion District. In the complaint and amended complaint, the plaintiffs pray that the bond given to Godbold, as Ordinary, by Gregg shall be canceled, and that the executors of Gregg may be decreed to pay to the plaintiffs the amount of principal and interest that may be found to be due thereon; and that on their failure to do so the plaintiffs may have the benefit of the statutory lien given by the Act of 1791, in the case of land sold for partition; and that in the event the sale made under the decree of the Ordinary be held to be illegal, that the premises be sold for the purpose of distribution among the plaintiffs. The further prayer is, that if this or any other relief against the representatives of J. Gadsden Gregg be disallowed, then that Asa Godbold, Jr., the administrator of Asa Godbold, late Ordinary, be decreed to pay the amount of the sale of the land or of the bond of Gregg, which he unlawfully received before maturity and in a worthless currency. The general prayer for relief is also inserted.

The defendants in their answers deny their liability as alleged in the bill and complaints, and submit that the Court cannot grant the relief demanded against them. The issues of law and of fact in the case were submitted to a Referee (special) for decision. A report has been submitted to the Court, in which it is determined that the plaintiffs are not entitled to recover against any of the defendants. Exceptions have been filed thereto. These raise the questions for the consideration of the Court.

The first exception alleges error on the part of the Referee "in holding that Godbold's agency to Robert L. Singletary terminated when the land belonging to estate of Reynolds brought over one thousand dollars." The Referee, in his report, says: "Before the sale R. L. Singletary, who, it seems, assumed to act for the plaintiffs, requested Godbold to bid off the land for him if it did not go beyond one thousand dollars. It sold for eleven hundred. Up to one thousand the bid of Godbold was as Singletary's agent; beyond one thousand dollars the bid was his own and he had the right to dispose of it as he chose, unless his relation to the parties was that of trustee." The conclusion of the Referee is fully sustained by the

testimony. R. L. Singletary says, in his testimony, he authorized Godbold to bid one thousand dollars. If he had bid more, Singletary was not bound, as his principal, to comply with the bid. There was no discretion given to Godbold; he had plain and positive directions and it was his duty to follow them. He did this up to the time the land was bid on to the amount of one thousand dollars or less, but when more than one thousand dollars was bid his agency terminated. The first exception is overruled.

The second exception charges error on the part of the Referee "in holding that Godbold could bid at a sale made under his own decree as Ordinary, and was not such a ministerial officer in a proceeding for the sale of real estate in his jurisdiction as made him an express agent for the plaintiffs and invested him with all the disabilities of a trustee and those occupying a fiduciary relation."

Was Godbold permitted to bid at a sale ordered by him as Ordinary, to be made by the Sheriff, for the purpose of partition? If he was, he did not occupy a fiduciary relation towards the plaintiffs and was not invested with the disabilities of a trustee. Was the Ordinary prohibited by statute from purchasing at his own sale? The Act of 1791 prohibited the Sheriff and Master in Equity from purchasing at their own sales and declared all purchases so made by them null and void. At the time of the passage of this Act the Ordinary had no jurisdiction in cases of partition. The Act of 1824 conferred this jurisdiction upon that officer. After the passage of this Act the same prohibition as to Sheriffs, Masters and Commissioners in Equity was made in the Act of 1839 without including the Ordinary, who at that time had the power to order a sale in proceeding for partition. The failure to include the Ordinary in the Act and prohibit him from purchasing at his own sale evidences the intention of the Legislature not to prohibit him, for the reason that he did not make sales but only ordered them to be made by the Sheriff as provided by law. There was manifest in the prohibition of Masters and Commissioners in Equity and Sheriffs from purchasing at their own sales. If allowed to do so, they might have purchased at an under price, and in every case where they desired to purchase property they may have declared a sale to themselves without affording an opportunity to others to bid. There was no necessity of a prohibition of this kind as to the Ordinary, for the reason that he made no sales, could not have an opportunity thus to obtain property at an under value, and the

law had provided that his sales should be made by another officer, who was prevented by the Act from purchasing at his own sale.

There is no ground, therefore, to rest the assumption that by fair intendment the Ordinary was also prohibited by the Act from making purchases at his own sales. A Circuit Judge grants orders for the sale of property in proceedings for partition, and for other purposes, and it might be said with the same propriety that he is also included in the provisions of the Act of 1791. This proposition would not be seriously maintained, and yet it could be if the other (that the Ordinary is certainly prohibited from doing so) can be.

The jurisdiction of the Ordinary in cases of partition was carved out of that of the Court of Equity. If the Chancellor, who exercised a similar jurisdiction in such cases, was not prohibited from purchasing at a sale ordered by him, there is no reason why an Ordinary should have been. In either case an officer was authorized by law to make the sales ordered by the Court, and he was inhibited from making a purchase at the sale so as not to prevent a fair and free competition at the same. But it is said if the Ordinary was permitted under the law to purchase at sales ordered by him, to whom was the bond to be given by the purchaser? The Act of 1839 did require the Ordinary to take the bond after the sale had been made and the Sheriff certified to him the purchaser. And in case the bond was not given, the Ordinary was authorized to order a resale at the risk of the former purchaser. The Sheriff was required by statute to make the sale, and in such cases he was, therefore, the ministerial officer of the Court of Ordinary, as the Clerks and Commissioners in Equity were of the Courts of Common Pleas and Equity. If the Ordinary purchased at the sale ordered by him, or any other reason prevented the taking the bond for him, why may not the Sheriff have taken it, as the ministerial officer in the particular sale? And when it became payable, why may he not have enforced it by suit against the Ordinary? And if the Ordinary failed to comply, why may not the Sheriff have resold without any order from the Ordinary for that purpose. If the Sheriff could not have thus acted as the ministerial officer of the Court in such cases, what was to prevent the Ordinary from executing a bond in his individual capacity to himself as Ordinary? Suppose the Sheriff could not take the bond, or the Ordinary, individually, could not give it to himself, in his official capacity, and

the Ordinary purchased at a sale and refused to comply,—could not the Court of Common Pleas, through one of its law Judges, have compelled the Ordinary to pay the amount of his bid in cash, or execute bond for the same, by reason of its supervisory jurisdiction over all inferior judicial tribunals? And if complaint was made, could not the Ordinary have been forced to order a resale, if he refused to comply, in the way of an appeal taken from an order requiring a resale? These are inquiries suggestive of a mode of obviating supposed difficulties in the way of an Ordinary having purchased at a sale ordered to be made by him.

I am of the opinion that there was no statute in existence in this State previous to the late war which, by its express terms, or by implication, inhibited an Ordinary from making purchases at sales ordered by him for partition. It appears from the testimony in this case that the Ordinary only bid, and did not purchase, at the sale of the land belonging to the estate of Reynolds. A sale is not complete until the terms of sale are complied with by the purchaser. The bid in this case was transferred, and Asa Godbold was not, therefore, the purchaser. The Act prohibits certain officers from making a purchase and declares the sale to be null and void. There is no provision made, therefore, as to the effect of a bid and the subsequent transfer *bona fide* of that bid. The sale was complete, by the defendant (Gregg) complying with the terms, and the purchase was, therefore, made by him, assuming that the Ordinary could not legally purchase at a sale ordered by him. Asa Godbold in this case did not violate the provisions of the law, and the sale could not, on this ground, be declared null and void.

Did the Ordinary act in his judicial or ministerial capacity in deciding to sell the real estate of Reynolds and during the sale made thereof by the Sheriff? In ordering the sale, it cannot be disputed that he acted judicially. The Act leaves it to his discretion to say whether land in a proceeding for partition shall be sold or not. When he makes a decision, it is a judicial act. In the discharge of his judicial duties, nothing short of willful default, amounting to corruption, would make him liable. In making the order of sale, he could not have been invested with the disabilities of a trustee.

In the sale, how did he act? Did he discharge mere ministerial functions, which made him an express agent for the plaintiffs, and imposed the liabilities and duties of a trustee upon him? The

statute prescribed who was to make the sale ordered by the Ordinary. The Sheriff was the officer designated, and he was thus required to act as the ministerial officer of the Court of Ordinary to perform ministerial duties in executing the judgment of the Court. The Ordinary had nothing to do with the sale; he was not the officer making it; another officer did so, and was responsible for his acts to the Court of Ordinary as its ministerial officer. The Act inhibited him from purchasing the property sold, and if he had done so the sale would have been null and void.

After the sale was made by the Sheriff, then the Act required a ministerial duty to be performed by the Ordinary. In discharging it as a ministerial officer, he might have been answerable in damages resulting from his neglect, though it did not amount to corruption or a willful default. From the time of the judicial act in ordering the sale up to the time of taking the bond, the Ordinary, by statute, is released from the performance of any ministerial duty and another officer is substituted in his place. When a sale was ordered by the Court of Equity, as soon as the judicial act was performed another officer was designated to make the sale in a ministerial capacity, and while this act was being performed the Chancellor was not performing any functions. So with the Ordinary while the Sheriff was acting under the statute as the ministerial officer of his Court.

The Ordinary was not, therefore, a ministerial officer during or at the time of the sale ordered to be made by the Sheriff; he was not a general agent for the plaintiffs, and could not have been invested with the disabilities of a trustee and others occupying a fiduciary relation. The Referee properly held that the sale made by the Sheriff of the lands of Reynolds was not void or voidable, upon the grounds indicated in the exception.

But let it be assumed that Godbold was a general agent at the time of the sale, and was invested with the disabilities attaching to a trustee, the sale, by reason of the bid, would have been either void or voidable at the option of the *cestui que trusts*. The plaintiffs in this case in their bill have elected to recognize the sale as valid and to pursue J. G. Gregg. This election, when once made, cannot be retracted. They are, therefore, bound by it, and the sale should be declared valid.

The second exception is overruled.

The third exception charges error on the part of the Referee " in holding that the payment of the notes of the Confederate cur-

rency, under the conditional agreement entered into between Gregg and Godbold, was a payment and satisfaction of Gregg's bond given to the Ordinary for the purchase of the land." Was the transaction between Gregg and Godbold a valid payment of the bond, which cannot now be set aside?

An Ordinary was required to take two classes of bonds—the one purely money bonds, for the purchase money of lands sold in proceedings for partition, and the other class bonds of administrators or persons acting in a trust capacity. He was authorized to receive money in the payment of the first class and to discharge the obligors thereof. The second class were bonds of a peculiar character, the condition of which required the faithful performance of certain acts on the part of the obligors, and these he was not empowered to settle and to discharge the obligors. This distinction should be regarded in the consideration of this case. There was no inflexible rule requiring Ordinaries and other officers to receive gold and silver in payment of debts owing to them in their official capacity. If one of these officers had received bank notes in payment of bonds due them, and they had suddenly perished by some calamity to the bank issuing them, they would not have been held responsible for the loss. They were, therefore, invested with some discretion in this matter.

If Godbold, then, had authority to receive payment of this bond and to discharge Gregg, and was invested with a discretion as to the kind of money to receive, did the payment of the money by Gregg and the surrender of the bond to him by Godbold amount to a valid payment of the bond? But it is said that at the time of the payment of the money there was an agreement which made the payment of the bond conditional. It appears that there was an understanding betw' en the parties. Godbold was to confer with Singleton, (R. L.,) and if he declined to take the Confederate currency the bond was to be returned by Gregg and his money restored to him. The conference with Singletary was to take place within eight or ten days, and if Gregg had no objection within that time he was to rest easy and to consider the condition of the payment removed. Gregg received no notice from Godbold of an unwillingness on the part of any one interested to receive the money until some time in August, 1864, when the payment had been made in February (January) of the same year. In April, Godbold had funded the money in a four per cent. Confederate bond for the

benefit of the estate of Reynolds.　Was Gregg bound to return the bond in August, 1864, under and according to the terms of this agreement?　He paid the money with the distinct understanding that it was to become an absolute payment if he was not otherwise notified in eight or ten days.　It seems that Gregg considered time as an essential part of the agreement.　It was material, too, that he should have done so.　The Confederate money was constantly depreciating, and he, like others in making contracts in reference to it, did not look far into the future.　It is not reasonable to suppose that he would have paid his money, and agreed to allow Godbold to retain it as long as he saw proper, and then exercise a discretion for himself and others whether he would receive it or not in payment of the bond.　If time, then, was an essential part of the agreement, after the expiration of ten days without notice to Gregg, the payment was absolute; but it is said the time was not of the essence of the agreement, and if Godbold notified Gregg within a reasonable time it was a substantial performance of the terms of it.　Time is not ordinarily of the essence of the contract when the parties can be placed *in statu quo* without injury, but this was impracticable in this case.　Gregg would be damaged by disregarding it.　The Confederate currency had depreciated considerably in August, 1864, and its employment in business transactions was difficult.　The end of the war, with a disastrous termination, was contemplated.　Public officers had at that time, under instructions from Chancellors and Judges, declined to accept it in payment of debts owing to them in their official capacity.　Private individuals also refused it in discharge of obligations due them at that time.　Gregg could not use it in payment of debts, whereas if it had been returned to him within the time agreed by Godbold he may have employed it for that purpose or others.　The character of the money had been changed by Godbold; it was invested in a Confederate bond, which was not readily convertible into anything else, in August, 1864.　Time, therefore, was of the essence of the contract in this case.

The agreement, then, between Gregg and Godbold became executed after the expiration of the ten days.　The default or negligence of Godbold may have contributed to this end, but this should not affect Gregg injuriously.　He was not at all responsible for the official conduct of this officer.　If the contract was executed without any fraud on the part of Gregg, there was unquestionably a

valid payment of the bond. There is nothing in the testimony to implicate in any way the defendant Gregg in anything like unfair dealing, collusion or combination with Godbold to injure the plaintiffs by the payment of the bond. It is true the money was paid before the bond was due, but this fact does not evidence bad faith on the part of Gregg. The interest was paid on the bond to its maturity. Gregg had communicated with Singletary, the supposed agent or friend of the plaintiffs, in reference to the payment of the bond and had no intimation of an objection on his part. His information was that Godbold was the party, as the agent of the plaintiffs, to receive the money in payment of the bond. This consultation through friends with Singletary evidenced a disposition on the part of Gregg to do nothing contrary to the wishes or interests of the plaintiffs. Knowing that Godbold held the bond, he applied to him to know if it could be·paid, and paid the principal and interest due up to maturity on the single condition that if it was not agreeable to Singletary he should be notified in eight or ten days and the bond was to be returned and the money returned.

After the expiration of the ten days, the agreement or understanding between Godbold and Gregg was an executed contract, and, there being no fraud on the part of the obligor, it cannot be opened against him. If the sale of the land was valid and the bond of Gregg has been satisfied, there is no necessity of considering the question whether a statutory mortgage was created in favor of distributees in cases of the partition or sale of lands made by the Ordinary. There can be no such mortgage in this case, and the land now in the possession of E. Miller is not subject to the payment of the purchase money.

The only remaining question is, can the estate of Asa Godbold and the sureties on his official bond as Ordinary be made liable to the plaintiffs for the amount of the Gregg bond and interest? In the answer and in the argument it is insisted that the plaintiffs cannot prosecute the suit against the administrator of Asa Godbold or his sureties for the reason that there is an injunction preventing them. The administrator of Asa Godbold, it appears, has filed a bill to marshal the assets of his intestate estate, and an order of injunction has been granted in that proceeding. The effect of such an order is to stay the hands of suing and other creditors except before the tribunal designated therein. The reason for the granting of an injunction in such cases is to prevent a multiplicity of

suits and a ruinous accumulation of costs against an estate. Sometimes the Court will suspend an injunction on application for this purpose when it is manifestly to the interest of all parties interested that it should be done. In the argument an intimation was thrown out that this course could be pursued in this case, and the ends of justice demand it. All the parties proper to be here are now before the Court, and to remand the plaintiffs to another tribunal would be doing them injustice when the very parties they would pursue have been ordered by the Court to be made parties to this proceeding. If remanded to another tribunal, the plaintiffs could not then make some of the defendants in the case parties who are necessary to a full understanding and an adjudication of the questions involved in it. The settlement, too, of the estate of Asa Godbold might be delayed, the funds belonging to it tied up and the creditors of some inconvenienced.

The claim is contingent, its character dependent as it is upon questions of law and fact, and can be adjudicated before this tribunal as speedily and satisfactorily as before the other indicated in the order of injunction. For these reasons the order of injunction is suspended for the purpose of a hearing of this case, but not so far as to allow the parties to enforce any judgment rendered in any other way than is provided in the order. There can be no doubt of the power of the Court to do this. The order was granted by the Court exercising equity jurisdiction, and this case is heard on the same side of the Courts.

It was further insisted upon in the argument that the Referee decided that Godbold, as Ordinary, is not responsible for the loss of the Confederate currency received by him to the plaintiffs, and there is no exception to this part of the report. The Referee did incidentally so hold in deciding as to the liability of Gregg, but distinctly announces that the plaintiffs are prevented from further prosecuting this suit against the estate of Godbold and their sureties by the injunction. This decision plainly implies that he did not give this question consideration and did not intend to announce in the report any decision upon it. Should the estate of Godbold and the sureties on the official bond be held liable for the amount of the Gregg bond because the payment was received before the bond became due in Confederate currency?

For any official default, the Ordinary was held liable to the parties injured. In the case of *Tolat* vs. *Dubose*, (7 Rich. Eq., 23,)

Chancellor Dunkin says: "In the discharge of his duty, no other rule can well be adopted than that an officer should exercise the same care, diligence and caution which a prudent man would employ in the management of his own funds."

Did Godbold exercise the care, diligence and caution which was required on the part of public officers? At the time of the sale, Godbold was the bidder. The Sheriff certified that he was the purchaser. The bid was transferred by Godbold to Gregg for the consideration of one hundred dollars. A profit was made by him out of the transaction. The party out of whom it was made complied with the term of sale by executing his bond to the person to whom the bonus was given. Here was an officer and a party out of whom he had made a profit of one hundred dollars entering into a contract—the one in his official and the other in his individual capacity. This isolated fact may not be significant, but it must be considered in connection with what subsequently followed. Before the maturity of the bond the obligor proposes to pay it; the officer acting as the agent of the plaintiffs, invested with a discretion, hesitated at first to accept payment in Confederate currency, but finally consented on the payment of the interest due up to maturity and the understanding that it was to be a conditional payment for a specified time. The fact of hesitation on the part of Godbold at first indicated that his judgment as a prudent man and careful officer was adverse to the reception of the money. The hesitation could not have proceeded from the fact of the offer of payment before the maturity of the bond, for the reason that the only condition of its being taken was that Singletary would receive that kind of money. Suppose it had been gold or silver,—would the officer have thought of consulting Singletary or any one else as to the reception of it before the bond was due? The reception of the Confederate money before the bond was due, taken in connection with the fact before mentioned of the profit made out of the obligor, is significant. Was the act of taking, particularly in the depreciated currency in circulation at that time, the act of a prudent man? In 1864, creditors were often unwilling to accept payment of notes and other obligations when they were due. Most of them resorted to all kinds of expedients to avoid receiving payment from their debtors, and in many instances positively refused, especially when the debtor was solvent and a prosperous man. Asa Godbold, as Ordinary and a creditor, was indisposed to receive the money from

Gregg, and his hesitation to do so incontestably establishes the fact. If prudent, how then at that time refused to receive Confederate money in payment of debts owing to them? Asa Godbold, as Ordinary, did not exercise the care and prudence exercised by prudent men in the management of their own affairs. His hesitation at first to receive the money evidences that he did not act as a prudent man or as his own judgment as a man dictated. It is not known how much influence the persuasion or importunities of the obligor, to whom he had transferred his bid, had upon his mind. The only fact known is that, after hesitation, the money was received and the bond surrendered conditionally.

It appears that Godbold not only received the money but surrendered the bond to Gregg, after an agreement that if Singletary would take the money the transaction between them would amount to a valid payment of the bond. Was the surrender of the bond a prudent act? Most persons, and particularly public officers, would certainly have retained the bond and the money, after giving a receipt for the latter, until it had been ascertained if the parties entitled would accept the Confederate notes. This fact, taken alone, signifies nothing; but when considered in connection with the fact that the obligor had paid Godbold one hundred dollars to get the land for which the bond was given, and the additional fact of the receipt of the money before the bond was due, it raises a suspicion that there was willingness on the part of Godbold to aid Gregg in paying the bond in Confederate money, although he did not consider it exactly prudent. Why was Singletary to be consulted? There is no proof that he was the guardian or the authorized agent of the plaintiffs. It is in proof that Singletary was employed in a distant part of the State but was occasionally at Marion. The plaintiffs resided constantly in the County; they were accessible in a few hours. Yet the agreement was that Singletary was to be consulted. There is some evidence that Singletary had been communicated with by Gregg, and that he intimated that Godbold was the proper party to receive payment of the bond. These facts, taken in connection with the others, may throw some light upon the transaction. After the agreement was made, Godbold, by his neglect, allowed it to become executed after the expiration of the ten days. Godbold, according to the testimony, calculated the time within which he could see Singletary, and then specified the eight or ten days. It was his duty to have performed his part of the

contract, namely, to see Singletary; and if it was impracticable to do so within the time, Gregg should have been notified and an extension of time asked. Nothing of this kind was done by Godbold. Would a prudent man, acting for himself, have done as Godbold?

In April, 1864, Godbold funded the money, or purchased with it a Confederate bond for the Reynolds estate. Up to this time he had not seen Singletary. He must have considered the contract between him and Gregg executed at that time. If not, why was the money considered by him as that of the Reynolds estate and not Gregg's? The act of funding, therefore, on the part of Godbold, evidenced that he considered the condition of the reception of the money from Gregg removed and the contract between them as executed. The act is also an admission by Godbold that he had been in official default by not conferring with Singletary before and promptly notifying Gregg. The acts of Godbold and all the facts show he was guilty of negligence as a public officer.

Gregg was notified in August, 1864, that Singletary declined to receive the money. There is proof that Singletary, prior to that time, had become a little offended with Godbold about the payment of the bond.

Singletary's conduct and conversation no doubt prompted the note to Gregg written in August, 1864. At that time Confederate money was constantly depreciating, and most persons clearly perceived what was to be the result of the war. Godbold's apprehensions, as a public officer, were excited about the receipt of the Confederate money, and he desired to avert the possible consequence of his own carelessness as a public officer by insisting then upon a performance by Gregg of his part of the agreement, when Godbold had already recognized it as an executed contract.

When all the facts and circumstances are fairly considered, I cannot come to the conclusion that Godbold, as Ordinary, exercised such diligence, caution and prudence as was required of him. It may be said that at the time he received the money other public officers and many private parties were accepting it in payment of debts owing to them; and, further, that the land belonging to the estate of Reynolds was sold in 1863, and it was expected from this that the purchaser was to pay for it in Confederate money. It may be true that officers and others did receive Confederate money, but they were not in the habit of doing so on obligations not due, as before observed. The general disposition was to avoid the reception

of it after the maturity of the debt. The sale was made in 1863, during the time when there was no other money but that of the Confederate States in circulation. But it is a fact that the money was constantly depreciating, and it was not worth so much in value in 1864 as it was in 1863.

The Ordinary in this case was invested with a discretion in those times, and he was bound, in the exercise of it, to act prudently and cautiously. Suppose land had been sold in 1864, and the purchase money had fallen due in 1865, would the Ordinary have been fault-less for receiving payment in 1865? If he exercised his discretion imprudently, he would have been held responsible for the act.

It may be said that the times when the transactions between Godbold and Gregg occurred were peculiar, and that they should be considered in deciding questions like the one before the Court. They should have due weight in connection with other things. But an officer should not now be released for a clearly incautious and imprudent act exclusively on the ground that it was performed in a "trying period." The case of *McPherson* vs. *Gray,* (14 Rich Eq., 124,) has been cited as authority to show the rule in such cases as this, and for the further purpose that Gray in that case was relieved, and the case under consideration is very similar in many respects. This case has been decided by the highest Court in the State. Other cases involving the liabilities of trustees have also been decided by the same Court. In carefully reading the cases, it will be observed that there was a manifest disposition on the part of the Court to excuse for alleged official default whenever there was the slightest doubt or there was opportunity to relax the rule adopted for deter-mining the liabilities of officers or persons occupying a fiduciary relation.

This was natural, for the war had not long been terminated, and the ruinous results of it had affected every citizen of the State, so far as his material interests were concerned. This may have been a justification of such a relaxation of the rule, and necessitated the application of it, as modified, generally; but there is not the same excuse now for such indulgences, and each case should be considered in reference to the established rule of law and the parts of the par-ticular case.

The defense in the case of Gray was put upon good faith and the state of the times. He was excused, because, as it is said in the case, Confederate currency was the only kind in circulation, passed

as money and was received by prudent men in the payment of debts. In this case it is further said that Gray did not officially call in the bond, and never received one whimper of admonition from the parties interested not to receive the money, although the bond was past due. It will be observed there are differences between the case of Gray and the one under consideration. Godbold received the money before the bond was due; Gray received it after it was due. It was unnecessary to admonish Godbold until just before the bond of Gregg fell due. The parties interested may have intended to do so. They should at least have had an opportunity. The bond held by Gray was past due,.and the parties interested had the opportunity of admonishing him. The decision of the Court was, in the case of Gray, that he acted in good faith in the line of his duty. Can the same be said of Godbold? His judgment was that the Confederate money ought not to be received. In taking it conditionally he exercised a discretion not to receive it on his own judgment; he failed to see Singletary or the parties in interest and get their approval of the receipt of it conditionally, and thereby received the money in payment of the bond against his own judgment. He did not, therefore, act in good faith, by exercising proper care, diligence and caution.

Looking at the act of Godbold, as Ordinary, in receiving the Confederate money in payment of Gregg's bond, in every aspect, the conclusion is forced upon me that he did not exercise the required care, diligence and prudence, and the act ought not to be sanctioned by the Court.

Shall the estate of Godbold and the sureties on the official bond be held liable for the amount of the Gregg bond and interest, or only the value of it, as ascertained by the Act of 1869? The land was sold in 1863, when there was no other currency than that issued by the Confederate States. It must have been regarded then as the medium of payment at the time of the sale. It appears that no announcement was made at the sale that it would not be accepted in payment. The land brought an inflated price. The plaintiffs petitioned for a sale of the land, and must have looked to Confederate currency as a medium of payment. All the circumstances of the case show that all the parties were dealing with reference to that currency at the time of the sale. If this were a contest between the plaintiffs and Gregg, the latter would be allowed to show what the interest of the portion was at the time the

sale was made and the bond was given. Godbold and his sureties should be allowed to do the same thing. As the parties dealt with reference to Confederate money, the value of the bond of Gregg must be determined by the Act of 1869. The value of the bond on the 2d day of February, 1863, as ascertained by the provisions of the Act of 1869, was five hundred and fifty-two dollars and sixty cents, and this amount, with interest from the 2d day of February, 1863, is the liability of the estate of Godbold and the sureties.

It is adjudged and ordered that the bill of complaint be dismissed as to the defendants J. Gadsden Gregg and E. Miller, and that the defendants, Asa Godbold, Jr., as administrator of Asa Godbold, Sr., and Edward B. Ellerbe, G. W. Berry, Evander J. Moody and John H. Moody, as sureties on the official bond of Asa Godbold, Sr., late Ordinary of Marion District, are liable to the plaintiffs for the sum of five hundred and fifty-two dollars and sixty cents, with interest from the 2d day of February, 1863, and that judgment is hereby rendered against them for this amount and interest in favor of the plaintiffs.

The defendants appealed.

*McIver & Wood, Sellers & Sellers,* for Godbold and his sureties:

1. The bringing of this action against the administrator of Godbold, in the face of the injunction, was a contempt of Court.

2. The injunction ought not to have been suspended for the purposes of this action, inasmuch as no notice of any such application was given; nothing of the kind mentioned in the complaint, and no order of the kind asked for at the hearing.

3. To allow such an application in an action where the creditors of Asa Godbold could not be heard, is calculated to work injustice to them, and ought not to have been done, especially when there was another action pending in the same Court to marshal the assets of the estate of Asa Godbold, in which, if anywhere, the motion to suspend the injunction should have been made, because there the creditors of Asa Godbold could have been heard.

4. If the action cannot be maintained against the administrator of Asa Godbold, neither ought it to be allowed against his sureties, as the only case in which an action of this kind can be brought against the sureties to a bond for the performance of official or other like duties is where the principal is beyond the jurisdiction of

the Court, which is not the case here.—*Teague* vs. *Dendy*, 2 McC. Ch., 209; *Glenn* vs. *Conner*, Harp. Eq., 267; *McBee* vs. *Crocker*, McM. Eq., 485; *Taylor* vs. *Taylor*, 2 Rich. Eq., 123; *Gaydon* vs. *Gaydon*, McM. Eq., 435; *Riddlespurger* vs. *Riddlespurger*, cited in McM. Eq., at p. 490, and *Cole* vs. *Cole*, on same page; *Wilson* vs. *Waterman*, 6 Rich. Eq., 523; *Wright* vs. *Eaves*, 10 Rich. Eq., 582.

5. If, however, the foregoing propositions cannot be maintained, then we say that the judgment of the Circuit Court is objectionable on the ground that, although overruling all the exceptions taken to the Referee's report, which decided that the complaint should be dismissed, he proceeds to decide the case upon points not made in the pleadings and not appearing in the report of the Referee.

6. The Circuit Judge bases his judgment upon the ground that Godbold was guilty of bad faith in accepting payment of the bond of Gregg in Confederate money before it was due, while no such question was, or could be, made under the report of the Referee.

7. If this question could be considered, then the Circuit Judge has erred in matter of fact:

*First*, in saying that the bond was not due when it was paid— the terms of the bond being "*on or before*" 2d February, 1864, and not *on* 2d February.

*Second*. In assuming that Godbold hesitated to receive payment on account of the currency; whereas the evidence is that his hesitation arose from the fact that the bond was not due, as he supposed.

*Third*. In saying that public officers and most prudent men were then refusing to accept Confederate money, when there was no evidence to this effect.

And he erred in law in saying that Confederate money · was depreciating rapidly from the time when the money was received to the 15th August, 1864, when the Act to determine the value of such currency shows that it was worth more in August than it was in January, 1864.—Rev. Stat., 315, § 2.

And he also erred in holding that Godbold was guilty of bad faith in receiving payment of the bond in Confederate money.— *McPherson* vs. *Gray*, 14 Rich. Eq., 124; MSS. case of Tupper, Master in Equity.

8. If bad faith is to be imputed to Godbold, by reason of the profit of one hundred dollars, made on the sale of the land, as intimated by the Judge, this ought not to affect the sureties, as

they were not then on his bond, their bond being dated 7th December, 1863.

*C. D. Evans,* for plaintiffs:

The decree of His Honor the Circuit Judge makes Godbold, Ordinary, and the sureties on his official bond liable to the plaintiffs and a decree as to them is rendered. It is not proposed to add to the reasoning or to the authority of the Court below.

2. The bidding off by Godbold of the land under his order of sale was illegal and void or voidable as contrary to public policy.— Inquiry as to history of Ordinary, 2 Black. Com., 474; Acts 1824, vol. 6, 248; A. A. 1839, 7 Stat., § 32; intendment of Stat. 1791, vol. 7, 263. In taking bond acts ministerially.—*Boggs* vs. *Hamilton,* 2 McC. R., 382; *Simmons* vs. *Watson,* 2 Speer, 97; *McRae* vs. *David,* 5 Rich. Eq., 475.

3. A fiduciary relation subsists between Godbold, Gregg and Miller.—*Fox* vs. *Macreth,* 1 Leading Cases in Equity, 72; *Butler* vs. *Haskell,* 4 DeS., 653, 765; Story, 315, 316; Hill's Trustees, 159; Story's Agency, § 20; 2 Story Eq. Jurisprudence, 1261; 4 Kent Com., 438; 1 Leading Cases Equity, American edition, 159; *Ex parte* Wiggins, 1 Hill Chancery, 353; *Sallee* vs. *Croft,* 7 Rich. Eq., 43. As to joint and several liability of Gregg and Miller, see Hill on Trustees, 520.

4. Liability of Gregg on his agreement to restore the bond; time not essence of contract generally.—2 Story, § 776; 2 Story, § 771; A. A. 1869, regulating value of Confederate currency, comparison of January and August, 1864; *Neeley* vs. *McFadden,* 2 S. C., 169; *Husman* vs. *Wallace,* 2 S. C., 208.

*Johnson & Johnson,* (for Wm. B. Timmons and James F. Pearce, executors of will of J. Gadsden Gregg:)

1st. Asa Godbold, Ordinary, had the right to receive payment of the bond of Gregg in any way that he might see proper and thereby to extinguish the same. *Bush* vs. *Kilcrease,* 1 Strob., 419.

2d. That the Referee held as a matter of fact that the bond of Gregg had been paid by him to Godbold, and the presiding Judge concurred in the opinion; and in such cases the testimony must be clear and overbearing before this Court will interfere.—1 Hill Ch., 76; *Blackwell* vs. *Searls,* 1 S. C., 116; *Austin* vs. *Kinsman,* 1 S.

C.,.97; *Hinton* vs. *Kennedy*, 3 S. C. On an appeal from the con-
curring judgment of the Commissioner and Chancellor, upon a
question of fact, the onus is on the appellant to show from facts
in evidence that there is *no reasonable doubt of the error.*

3d. That time in this case was material and entered into the
essence of the agreement.—1 Parsons on Contracts, 565, and 2d,
659 and 660; Chitty on Contracts, 336; Story's Equity, 776, bot-
tom of marginal note 4.

4th. It was impossible for Godbold, in August, to place Gregg in
the same condition he was in January, from the fact that one-third
of the money had been repudiated by the funding Act, and that
particular money had been funded by Godbold for the benefit of
the estate of Reynolds.—*Townsend, Arnold & Co.* vs. *Stephenson &
Walker,* 4 Rich., 59.

May 2, 1876. The opinion of the Court was delivered by

WILLARD, A. J. The conclusions of the Circuit Court are in
accordance with the judgment of this Court, but the propositions
upon which those conclusions rest appear to require modification.

The Circuit Judge holds that the transfer by Godbold of his
bid, on the purchase of the property to a third person had the
same effect as it regards the rights of Godbold and his purchaser
as if the purchase had been originally made in the name of such
third person.

The grounds upon which this conclusion is placed are not clear
to our minds. Assuming that Godbold was competent to bid at a
sale ordered by himself as Ordinary—an assumption that we think
we are bound to make in the position of the case before us—then he
became liable for the purchase money. He certainly could not
discharge himself from this liability by any act of his own except
payment. Selling his bid to a third person for a profit to himself
could work no such change in his obligation in his favor. Taking
security to himself either individually, or as Ordinary, for the pay-
ment of the purchase money, while it might increase the sources
to which the parties entitled to the money might be enabled to
look, could not diminish his own individual liability. It was
clearly the duty of the Ordinary to have the amount of the pur-
chase money in hand at the time the credit for the purchase money
expired. He could, as Ordinary, offer no excuse based upon his
individual default for not having the money in hand at that time.

The plaintiffs are not in any way affected by the transactions of Godbold with Gregg. They are not bound as assenting to any of those transactions. If Godbold undertook to hold Gregg's money until a time when the plaintiffs might be compelled to receive it, and before that time the money became lost or otherwise unavailable, that cannot prejudice the plaintiffs, who were not parties to such transaction.

It is clear, then, that Godbold and his sureties were properly adjudged liable for the credit portion of the purchase money.

The objection that the decree virtually violated an injunction restraining the prosecution of suits against the personal representative of Godbold, issued in an independent action, is not well taken.

The Circuit Court, having all the necessary parties before it, had complete control over that injunction, so far as it affected proceedings in this case.

*Moses*, C. J., and *Wright*, A. J., concurred.